# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| THEODORE WESSELMANN, | |
| Plaintiff, | Case No. 20-CV-4052-LTS-KEM |
| vs. | |
| KILOLO KIJAKAZI, | **REPORT AND RECOMMENDATION** |
| Acting Commissioner of Social Security, | |
| Defendant. | |

Plaintiff Theodore Wesselmann seeks judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying his applications for disability insurance (DI) benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and supplemental security income (SSI) benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. Wesselmann argues the administrative law judge (ALJ) erred in determining the frequency of his seizures and limitations therefrom. I recommend **reversing** the Commissioner's decision and **remanding for further proceedings**.

## I.  BACKGROUND

Wesselmann has suffered from seizures for decades. Despite this impairment, he worked for years (beginning in January 1999) loading trucks at a meatpacking plant. AR 64-65, 252, 273.[1] Over the years, his employer imposed restrictions based on his seizures: he had to stay at floor level and could not work on catwalks or ladders; and he could not work around power tools or use knives. AR 65, 69, 72. In addition,

---

[1] "AR" refers to the administrative record below, filed at Docs. 12-2 to 12-7.

Wesselmann does not drive because of his seizures (he has not had a driver's license since the 1990s). AR 63. When he had a seizure at work, his employer required him to see a doctor and obtain a doctor's note before he could return, resulting in unscheduled absences (Wesselmann would obtain the note from his primary care physician, David Archer, MD, who prescribed Wesselmann's seizure medications). AR 71. Wesselmann was ultimately fired after he suffered a seizure and grabbed the nearby nurse while unconscious. AR 65. His employer believed his seizures posed a danger to other employees. *Id.*

From January to May 2015, Wesselmann worked in telemarketing. AR 280, 287.[2] He reported that any hours missed due to seizures had to be made up, adding stress to a position that was already stressful. AR 287. In March 2015, he filed for disability benefits; these prior applications were denied on initial review in July 2015 and on reconsideration in September 2015. AR 113.

Wesselmann began working part-time (twenty to twenty-five hours a week) as a gas station clerk in December 2016. AR 13, 63, 272-73, 366. He worked in the store alone without another employee or supervisor present. *Id.* In February 2017, he suffered a seizure that caused him to wander off the job, walking five or six blocks before being stopped by a police officer. *Id.* As a result, his employer determined he could not work the store by himself, and his hours were reduced to only three hours a week, during times when there would be supervision. *Id.* Wesselmann quit, noting it did not make sense to walk four miles round trip to work a three-hour shift. *Id.* Wesselmann was not taking seizure medications at the time—as the ALJ noted, Wesselmann did not take his medications for approximately a year between 2016 and 2017 when he did not have health insurance. *See* AR 16, 364, 366, 448; *see also* AR 138-39.

---

[2] It is unclear from the record how this job ended. I note, however, that although the vocational expert included telephone solicitor in Wesselmann's past relevant work and grouped that job with others the ALJ found Wesselmann could perform, the ALJ did not include the telemarketing job as past relevant work (mentioning only the meatpacking job) and did not find Wesselmann could return to his past relevant work. AR 18, 75-76, 355.

A hearing was held on Wesselmann's prior disability applications in May 2017, and a written opinion issued denying his claims the next month. AR 87-96. The Appeals Council denied review in March 2018. AR 102-104.

Wesselmann filed the current disability applications in April 2018, once again alleging disability based on epilepsy. AR 113. He alleged a disability onset date of November 2015 (based on his birth date categorizing him as advanced age at that time). *Id.*; *see* AR 87. The Social Security Administration denied his applications on initial review in July 2018 and on reconsideration in October 2018. AR 108-157. In connection with those reviews, state agency medical consultants Jan Hunter, DO, and Donald Shumate evaluated Wesselmann's residual functional capacity (RFC)[3] based on their review of the treatment records and other evidence. AR 116-18, 141-43.

Wesselmann requested review before an ALJ, and the ALJ held a hearing by video on November 12, 2019. AR 10, 58. The ALJ issued a written opinion on November 21, 2019, following the five-step process outlined in the regulations[4] to determine Wesselmann was not disabled from November 20, 2015 (the alleged onset date), through the date of the decision. AR 10-20. The ALJ noted that Wesselmann's gas-station earnings in 2017 were at the "substantial gainful activity" level for a little more than a month, but the ALJ found this an unsuccessful work attempt and therefore not substantial gainful activity. AR 12-13. At step two, the ALJ found Wesselmann suffered from one

---

[3] RFC means "the most that a claimant can do despite her limitations." **Sloan v. Saul**, 933 F.3d 946, 949 (8th Cir. 2019).

[4] "The five-part test is whether the claimant is (1) currently employed and (2) severely impaired; (3) whether the impairment is or approximates a listed impairment; (4) whether the claimant can perform past relevant work; and if not, (5) whether the claimant can perform any other kind of work." **King v. Astrue**, 564 F.3d 978, 979 n.2 (8th Cir. 2009); *see also* **20 C.F.R. § 404.1520(a)(4)**. The burden of persuasion always lies with the claimant to prove disability, but during the fifth step, the burden of production shifts to the Commissioner to demonstrate "that the claimant retains the RFC to do other kinds of work[] and . . . that other work exists." **Goff v. Barnhart**, 421 F.3d 785, 790 (8th Cir. 2005) (quoting **Eichelberger v. Barnhart**, 390 F.3d 584, 591 (8th Cir. 2004)).

severe impairment: epilepsy. AR 13. For purposes of determining Wesselmann's ability to work (at steps four and five), the ALJ determined Wesselmann's RFC:

> [Wesselmann] has the [RFC] to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant can frequently climb ramps and stairs, but never ladders, ropes, or scaffolds. He can frequently balance, stoop, kneel, crouch, and crawl. He should have only occasional exposure to extreme cold, extreme heat, excessive vibration, and irritants, such as: fumes, odors, dust, gases, and poorly ventilated areas. He should avoid all exposure to hazardous machinery and unprotected heights. On about 3 occasions per month, due to seizure activity and the need to recuperate, the claimant would need unscheduled breaks of 15-30 minutes duration.

AR 14. Based on Wesselmann's RFC, age, education, and work experience, the ALJ found that Wesselmann could not perform his past work (at step four) but that jobs existed in significant numbers in the national economy Wesselmann could perform (at step five), including counter and rental clerk, mail clerk, and office helper. AR 18-19. The ALJ relied on testimony from a vocational expert (VE) in making this determination. AR 19.

Wesselmann appealed and submitted new evidence: records from his employment at the meatpacking plant. AR 2. The Appeals Council declined to exhibit this evidence, finding it did "not show a reasonable probability that it would change the outcome of the decision." *Id.* The Appeals Council denied review on September 2, 2020 (AR 1-3), making the ALJ's decision the final decision of the Commissioner.[5]

Wesselmann filed a timely complaint in this court, seeking judicial review of the Commissioner's decision (Docs. 1, 3).[6] The parties briefed the issues (Docs. 15-16, 18-19), and the Honorable Leonard T. Strand, Chief United States District Judge for the Northern District of Iowa, referred this case to me for a Report and Recommendation.

---

[5] *See* **20 C.F.R. §§ 404.981, 416.1481**.

[6] *See* **20 C.F.R. § 422.210(c)**.

4

## II.    DISCUSSION

A court must affirm the ALJ's decision if it "is supported by substantial evidence in the record as a whole."[7]  "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."[8]  The court "do[es] not reweigh the evidence or review the factual record de novo."[9]  If, after reviewing the evidence, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [ALJ's] findings, [the court] must affirm the decision."[10]  The court considers new evidence submitted to the Appeals Council, determining "whether the [ALJ's] determination is supported by substantial evidence on the record as a whole, including the new evidence submitted after the determination was made."[11]

Wesselmann argues that the ALJ erred by failing to fully credit Wesselmann's subjective complaints and Dr. Archer's medical opinion.  To support both of these arguments, Wesselmann argues substantial evidence does not support the ALJ's determination of the number of workplace seizures Wesselmann would suffer in a month.  Wesselmann also argues the ALJ should have included additional limitations in his RFC based on his seizures, like the need for supervision.  As his final argument, Wesselmann argues that some medical evidence does not support the ALJ's RFC determination.

### A. RFC

Wesselmann raises similar challenges to the weight the ALJ assigned his subjective complaints and Dr. Archer's medical opinion.  When evaluating the credibility of a

---

[7] *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *see also* **42 U.S.C. § 405(g)**.

[8] *Kirby*, 500 F.3d at 707.

[9] *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994).

[10] *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

[11] *Riley v. Shalala*, 18 F.3d 619, 622-23 (8th Cir. 1994).

5

claimant's subjective complaints—including pain or nervousness—the ALJ must consider the factors set forth in *Polaski v. Heckler*: "(1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions."[12] "Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints."[13] The ALJ may not discredit the claimant's allegations based solely on the absence of objective medical evidence, but the ALJ may rest his credibility finding on "objective medical evidence to the contrary"[14] or "inconsistencies in the record as a whole."[15] Courts must "defer to an ALJ's credibility finding as long as the 'ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so.'"[16]

For claims filed after March 2017 (like Wesselmann's), the ALJ no longer "assign[s] a specific weight to medical opinions."[17] Instead, the ALJ "evaluate[s] the persuasiveness of medical opinions" considering the following factors: (1) supportability, i.e., "the objective medical evidence and supporting explanations presented by a medical source" in support of his or her opinion; (2) consistency with "evidence from other medical sources and nonmedical sources"; (3) the relationship between the opinion's author and the claimant, such as whether the opinion is from a treating source; (4) whether the medical opinion is by a specialist; and (5) "other factors

---

[12] ***Black v. Apfel***, 143 F.3d 383, 386 (8th Cir. 1998); *accord **Jones v. Callahan***, 122 F.3d 1148, 1151 n.3 (8th Cir. 1997); ***Polaski***, 739 F.2d 1320, 1321-22 (8th Cir. 1984), *vacated*, 476 U.S. 1167 (1986), *reinstated*, 804 F.2d 456 (8th Cir. 1986).

[13] ***Black***, 143 F.3d at 386.

[14] ***Ramirez v. Barnhart***, 292 F.3d 576, 581 (8th Cir. 2002).

[15] ***Brockman v. Sullivan***, 987 F.2d 1344, 1346 (8th Cir. 1993).

[16] ***Schultz v. Astrue***, 479 F.3d 979, 983 (8th Cir. 2007) (quoting ***Hogan v. Apfel***, 239 F.3d 958, 962 (8th Cir. 2001)).

[17] *Revisions to Rules Regarding the Evaluation of Medical Evidence*, **82 Fed. Reg. 5844**, 5858 (Jan. 18, 2017); *see also* **20 C.F.R. §§ 404.1520c(a), 416.920c(a)**.

that tend to support or contradict a medical opinion," such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the Social Security Administration's] policies and evidentiary requirements."[18] The first two factors, supportability and consistency, are the most important.[19] The ALJ is required to "articulate how [the ALJ] considered the medical opinions" and "explain how [the ALJ] considered the supportability and consistency factors."[20]

Wesselmann testified at the hearing in November 2019 that he averages one seizure a week, but it varies—sometimes he will have seizures every eight to ten days, sometimes he will have seizures "back to back." AR 66. He said that 75-80% of the time, he fell to the floor when having a seizure (but did not thrash; he does not have grand mal seizures). *Id.* He explained that a typical seizure lasted thirty seconds to a minute, but when he first got up, he would not be cognizant—he might talk to a person and that person might think he knew what was going on, but fifteen to thirty minutes later, he would not remember what happened immediately following the seizure. AR 66-67.[21] He gave an example from twenty years ago in which he had a conversation with a coach while umpiring a baseball game that he ultimately did not remember, and because he had not fallen down, no one realized he had had a seizure. AR 67-68. He said he was often physically exhausted after a seizure and needed to lie down. AR 70. He indicated that he had had seizures at a bank, a post office, a fast food restaurant, in front of his landlord, and at his attorney's office (scaring his attorney's wife). AR 67, 72. Wesselmann

---

[18] **20 C.F.R. §§ 404.1520c(a), (c), 416.920c(a), (c)**.

[19] **20 C.F.R. §§ 404.1520c(a), 416.920c(a)**.

[20] **20 C.F.R. § 404.1520c(a), (b)(2), 416.920c(a), (b)(2)**.

[21] He similarly reported in function reports that he suffered one to two seizures a week and fell about two times a month due to seizures (May 2018); that his seizures lasted thirty seconds to a minute and resulted in him feeling tired and disoriented for thirty to forty-five minutes afterward, and he estimated suffering three to four seizures in the last month, ten to fifteen in the last six months, and thirty to forty in the last year (July 2018); and that he averaged one seizure a week (December 2018); and that "he came out of each seizure after several minutes and then it takes . . . about an hour before [he] feel[s] back to normal." AR 26, 291-92, 316, 339.

provided a "seizure journal" in which he marked the days he had had seizures. *See* AR 72, 303-04, 340, 347-53. He noted he usually did not know that he had had a seizure right away (because of being unconscious when he first came to), but he marked the calendar when he discovered a scraped knee or something out of place that he did not remember moving or bumping into. AR 72.

As the ALJ noted, Wesselmann did not usually seek medical treatment after suffering from a seizure. AR 16. The medical records before the ALJ (mostly from Dr. Archer) reflect the following about Wesselmann's seizures:

- May 27, 2015 (AR 370, 373): Wesselmann reported suffering a seizure that day and skinning his arm and back. He also complained of body soreness. Dr. Archer offered support in Wesselmann's disability application.

- July 28, 2016 (AR 367): Dr. Archer noted Wesselmann had been without health insurance for a while.

- December 19, 2016 (AR 366-67): Wesselmann complained of shoulder pain, noting he had had a seizure over the weekend and awoke to the pain. He confirmed he did not drive and was not tempted since having an accident ten years ago.

- March 30, 2017 (AR 366): Wesselmann stated he had not been taking his seizure medications for the last six to eight months, and the frequency of his seizures were unchanged. He also complained about the gas station where he worked cutting his hours after he had had a seizure the month prior, walked away from his post, and been found wandering around an ATM at the bank after someone called the police believing he was a drunk person.

- April 3, 2017 (AR 364, 366): Wesselmann reported seizures every two to three weeks, more when stressed, and he agreed to restart his medications (despite "tend[ing] to deny he had a seizure disorder"). Dr. Archer noted that he should follow up to check his blood levels to ensure his medications were

8

in the therapeutic range and that he should see a neurologist (Wesselmann did neither).

- September 26, 2017 (AR 361, 363): During a visit to discuss moles and disability, Dr. Archer again noted that Wesselmann had not had any lab work since 2014 and that he needed to see a neurologist. Wesselmann reported suffering about one seizure a week, most of which were "minor and at times behavioral." Dr. Archer noted "less than ideal control" of his seizures. The record reflects Wesselmann had health insurance again.

- October 10, 2017 (AR 372): Blood work showed less than an optimal range of Keppra, one of Wesselmann's two seizure medications.

- July 31, 2018 (AR 416, 419): A person on the street witnessed Wesselmann fall and called 9-1-1. By the time the ambulance arrived ten minutes later, Wesselmann was standing up and alert and oriented, and he refused to go to the hospital (although he allowed paramedics to check his vital signs). Wesselmann said he remembered walking down the street and saying hello to someone he knew, and the next thing he remembered was lying on the ground. He said he must have had a "little seizure." He had a small abrasion on his elbow.

- May 8, 2019 (AR 444, 447): Wesselmann expressed frustration with the amount of time it was taking to get a job or disability benefits. Dr. Archer increased his Keppra dosage.

- June 17, 2019 (AR 439): Wesselmann reported bad constipation and sleeping sixteen to eighteen hours a day since the change in medication dosage. Dr. Archer instructed Wesselmann to titrate the dosage down to the amount previously tolerated.

- September 23, 2019 (AR 457-58): Blood work revealed Wesselmann's seizure medications were in the therapeutic range.

The record also contains Dr. Archer's medical opinion, consisting of a "seizure questionnaire" he completed in October 2019. AR 460-63. He noted Wesselmann continued to have seizures despite therapeutic blood levels of medication. AR 460. He described Wesselmann's seizures as "[m]ostly atonic seizures" associated with "a pass-out spell," disorientation, and postictal depression, confusion, and sleepiness. AR 461-62. He stated that Wesselmann's seizures were unpredictable, and he estimated they occurred weekly (four to five times a month). AR 462-63. He concluded Wesselmann was "not employable." AR 463.

After the ALJ issued his decision, Wesselmann submitted records from his former employment at the meatpacking plant (spanning from 2007 through 2014). AR 31-56. These records reflect the following number of workplace seizures: 2 in 2007, 5 in 2008, 3 in 2009, 6 in 2010, 3 in 2011, 1 in 2012 (but he took medical leave after suffering two seizures on back-to-back days outside of work); 6 in 2013; and 9 in 2014 (through early September 2014). Thus, these records support that Wesselmann suffered an increased number of seizures toward the end of his employment. *See also* AR 38 (October 2013 note from Dr. Archer reflecting "increased rate of seizure activity").[22] Wesselmann often denied or tried to hide his seizures from his employer, since its policy required him to obtain a doctor's note before he could return to work, which Wesselmann complained resulted in unpaid time off and increased medical bills. The description of Wesselmann's seizures in the workplace records are consistent with his testimony—the records reflect that Wesselmann often fell to the floor, that his seizures usually lasted around thirty seconds to a minute, and that he often needed to rest for a short period afterward. By the time the nurse arrived, he was usually alert and oriented (although not always

---

[22] Contrary to what the Commissioner now argues, the ALJ recognized that Wesselmann's work history is consistent with Wesselmann "experiencing a loss of capacity to work on or around the alleged onset date" (but ultimately, the ALJ found Wesselmann's restrictions did not preclude other work). AR 17.

oriented) and either on his feet or being helped up. He described the aftermath of a seizure as feeling like he had gotten his butt kicked.

In 2013 and 2014, the records reflect an increase in seizures in which Wesselmann did not fall to the floor, but rather, engaged in odd behavior (he never had any memory of what he had done). In February 2013, he grabbed a female employee on the shoulder with one hand and on the breast with the other hand while drooling and mumbling, then walked away. AR 42. In June 2013, he shook a chair in his supervisor's office with a glazed look on his face. AR 41. In September 2013, he began hitting his arm against the wall accompanied by drooling, rolling his eyes back, rigidity, and body tremors. AR 40. In October 2013, he hit his stapler and knocked papers on the ground during a seizure. AR 38. In January 2014, he knocked items off the counter with one hand while his coworkers supported him, and he drooled. AR 38. On September 3, 2014, a coworker witnessed Wesselmann lying on the floor, then he got up and walked to the women's locker room but was stopped from entering; when the nurse arrived, he walked away briskly, swaying and bumping into the walls, and his eyes were out of focus. AR 32. On September 6, 2014, Wesselmann suffered the seizure that ultimately resulted in his termination. The record from his employer supports his version of events:[23]

> [Wesselmann] begins to have a seizure [while in the nurse's office] and grabs a hold of [a] pillow and is flopping it up and down on [the] bench. [Wesselmann] stays seated during [the] seizure[,] which lasts approximately 40 seconds. [Wesselmann] appears to become more alert and hops off [the] bench aimlessly grabbing at this [nurse] and running in[to] things. [The nurse a]ttempt[s] to reorient [Wesselmann], he is laughing and continuing to grab at th[e] nurse. He follows her behind [the] nurse's station and continues to grab at her. [A supervisor is] present and talks to [Wesselmann] and asks him to sit down[,] which [Wesselmann] complies with. He is not totally alert yet at this time. He sits for another 5 minutes and is alert and oriented x 3. [He uses the restroom and] returns 5 minutes later ready for work. Appears pale and tired. States he is feeling

---

[23] The Commissioner cites to an order from Wesselmann's disability-discrimination lawsuit against his former employer on Westlaw. I have not considered information in this order as it is outside the administrative record.

11

> lightheaded and nauseated. [A supervisor a]ccompanies [Wesselmann] back to the bathroom where he [vomits].

*Id*.

The ALJ recognized that the treatment records did not document every seizure suffered by Wesselmann. Therefore, the ALJ found the medical records were "not a reliable indicator" of Wesselmann's seizure frequency. AR 16. Instead, the ALJ "accept[ed Wesselmann's] seizure diary as the best available indicator of the frequency of the seizures."[24] *Id*. The ALJ found that the seizure diary reflected Wesselmann experienced seizures "between zero and six times per month, with an overall average of four seizures a month,"[25] consistent with Wesselmann's testimony and Dr. Archer's opinion. *Id*. But the ALJ reasoned that because not all Wesselmann's seizures would occur during the forty hours a week he was at work, the RFC should reflect a reduced number of seizures. *Id*. The ALJ thus found Wesselmann would suffer three workplace seizures a month. *Id*.

Wesselmann takes issue with the ALJ's calculation of his monthly average number of seizures, arguing that the ALJ counted partial months in the seizure journal as full months, lowering the average. Wesselmann also argues that the ALJ erred in basing his RFC limitation on the average number of seizures Wesselmann suffered a month, rather than the maximum number of seizures Wesselmann might suffer a month. Wesselmann

---

[24] The Commissioner takes issue with the ALJ's reliance on the seizure journal, noting it shows Wesselmann suffered seizures on four particular dates in June 2018, while he reported to the Social Security Administration on July 4, 2018, that he had suffered seizures on three different dates in June. AR 291, 303. But the ALJ could have found the dates on the form to the Social Security Administration were estimates, as the form also asked how many seizures Wesselmann had had in the last month, and he responded, "3 to 4?" AR 291. Overall, reporting that he had suffered three to four seizures in June 2018 is consistent with the seizure journal.

[25] As Wesselmann notes, he recorded seven seizures in February 2019 (two on weekends); he also recorded six seizures in January, March, April, and June 2019 (and in January, all six seizures occurred on weekdays), while he recorded zero seizures in January 2018. AR 303, 340, 349-50.

argues that this mistake resulted in the ALJ erroneously discounting his subjective complaints and Dr. Archer's RFC opinion.

By my count, Wesselmann's seizure journal reflects 91 seizures (the ALJ counted 88, perhaps missing circled dates that photocopied faintly when Wesselmann resubmitted his seizure diary).[26] *See* AR 303-04, 340, 347-53. The seizure journal includes twenty-one full months,[27] but as Wesselmann notes, his attorney received and stamped the entry for December 2018 on December 5, 2018—and there is no other record of the rest of December 2018. *See* AR 304. The ALJ determined the four-seizures-a-month average by dividing 88 seizures by 22 (full) months (which is exactly 4) (AR 16), but the actual monthly average based on the seizure diary would be a little more than four, around 4.3.

Any error in calculating the frequency of Wesselmann's seizures may be harmless, but the VE testimony is not entirely clear. The ALJ first asked the VE about a hypothetical person with Wesselmann's RFC, minus the need for three breaks a month due to seizures. AR 75. The VE testified that such a person could perform Wesselmann's past work as a telemarketer or work as a counter and rental clerk, mail clerk, or office helper (the three jobs the ALJ ultimately found Wesselmann could perform). AR 19, 75-76. The ALJ then asked whether competitive employment would be precluded for a person who suffered "three seizures per month at work, each one resulting in an unscheduled break of 15 to 30 minutes in duration" (the ALJ did not specify that the person still suffered the previously identified limitations). AR 76. The VE said no (without identifying specific jobs). AR 77. On cross-examination, Wesselmann's

---

[26] The Joint Statement of Facts states that a date underlined rather than circled in September 2018 reflects a seizure (Doc. 15), but it seems more likely the underline delineates the date midway through September that Wesselmann began tracking his seizures on that calendar, as he had used a different calendar for the first part of September before submitting it to the Social Security Administration. *See* AR 303-04.

[27] Wesselmann suggests September 2018 may not be a full record, but the entirety of the month is included over two calendar entries. *See* AR 303 (first half of the month), 304 (second half of the month).

13

attorney sought to clarify that three unscheduled breaks a month would not preclude employment. *Id*. The VE said the need for unscheduled breaks was not included in the RFC. *Id*. Wesselmann's attorney rephrased, stating:

> Let's . . . place it within the realm of this gentleman, and say that he experienced at least three seizures a month, up to five seizures a month, and as a consequence, he had to have the employer allow him to take up to 15 to 30 minute[] unscheduled breaks, every month.

*Id*. The VE responded that competitive employment would not be precluded for such an individual. AR 77-78. The VE explained:

> [A]s long as someone's within ten percent off-task, they can maintain the employment definitely [sic]. It's once you start to go beyond that, you know, at three and five a month you're still, unless there was something else that was dragging down an individual's work performance that goes within the realm of work activity, as long as they were productive during the hours they were working, at 15 to 30 on each of those days, in my experience, employers would certainly maintain their employment over the long term.

AR 78. Wesselmann's attorney asked, "how many unscheduled breaks would eventually preclude competitive employment?" *Id*. The VE responded, "once you start to move into . . . three unscheduled breaks for 15 minutes or more, you certainly would eliminate employment at that amount." *Id*. The VE clarified he meant three unscheduled breaks a day. *Id*. Wesselmann's attorney then sought to confirm that an employer would tolerate two unscheduled breaks daily lasting up to thirty minutes at a time, and the VE replied, "I thought you said 15 minutes." *Id*. Wesselmann's attorney said that the hypothetical was "15 to 30," and the VE said, "I just heard 15." AR 79. The VE said two fifteen- to thirty-minute breaks a day would eliminate employment. *Id*. Wesselmann's attorney then asked, "How about say, three or four a month?" *Id*. The VE responded:

> The three or four day[s] of the month, at that point you've dragged someone far enough off-task that an employer would really count that as an absenteeism . . . , because now you've moved beyond the point of where,

14

at least in my experience, productivity is lost to the point . . . that an employer really notices that activity would reduce that employment.

*Id*.

Neither counsel nor the ALJ asked the VE any more questions about the frequency of unscheduled breaks or seizures affecting an employee's ability to work. The VE additionally testified that if a person walked off the job due to a seizure, most employers would treat that as an absenteeism and not tolerate the behavior. AR 79-80. Counsel also asked whether falling during a seizure while other people were around would affect employment. AR 80. The VE responded:

> [B]ased on the other conditions of the RFC, that certainly is, in my experience we try to focus someone in an area that they would certainly be more open and accepting, like the route of a telephone solicitor[] or some other type of office job.

*Id*. The VE agreed that it was difficult to predict whether an employer would accommodate someone with an active seizure disorder and that a meatpacking plant would be less likely to accommodate a seizure disorder than an office setting. AR 81.

When the claimant argues the ALJ should have included an additional limitation in the RFC, any error is harmless when the VE testimony establishes work would still exist for the claimant to perform, even with the additional RFC limitation.[28] Here, the VE testified that even if Wesselmann suffered more than three workplace seizures a month, competitive employment would not be precluded—as long as his seizures did not render him off task more than ten percent of the time. But when Wesselmann's attorney attempted to learn how many workplace seizures a month would render a person unemployable, the VE testified that if a person needed three or four fifteen- to thirty-minute breaks a month, they would not be able to work. This apparent contradiction within the VE's testimony can perhaps be reconciled as the VE suggesting that an employer would treat unscheduled breaks due to seizures differently than unscheduled

---

[28] *Crissey v. Saul*, No. 4:20-CV-00476-WJE, 2021 WL 2624514, at *4 (W.D. Mo. June 25, 2021).

15

breaks for other reasons; the VE testified that a greater number of breaks would be tolerated when counsel's question specifically noted the breaks were due to seizures. But on the other hand, the VE should have known that all of counsel's questions meant to involve breaks due to seizures, as that was the hypothetical given by the ALJ and the impairment suffered by Wesselmann. At the very least, the VE should have clarified that he believed an employer would handle breaks due to seizures differently than breaks for other reasons.

Wesselmann also argues that the ALJ should have included an RFC limitation requiring Wesselmann to have supervision, or otherwise accounting for the fact that Wesselmann's seizures might cause him to engage in odd behavior, like grabbing a person or wandering away from his post. I agree. In addition to Wesselmann's testimony, the treatment records from Wesselmann's prior employer are replete with evidence of Wesselmann's seizures causing him to engage in behavior that affected other employees—especially in his last year of employment. Indeed, Wesselmann lost two jobs—at the meatpacking plant and the gas station—not because of needing unscheduled breaks due to his seizures, but because of his behavior while having seizures. The ALJ explicitly credited Wesselmann's testimony that he lost the job at the gas station after he wandered away from his post during a seizure (AR 13) but did not include any RFC limitation preventing something similar from happening again. I do note, however, that the ALJ did not have the benefit of the additional treatment records from Wesselmann's employer, which further support the need for such an RFC limitation.[29]

I recommend finding that substantial evidence does not support the ALJ's RFC determination.

---

[29] I also note that for the most part, the ALJ's opinion is well-reasoned and fair to Wesselmann—for example, suggesting that financial reasons were likely the reason he did not take his medications in 2016 and 2017—unlike the Commissioner's briefing, which makes arguments inconsistent with the ALJ's findings and unsupported by the record.

16

### B. *Some Medical Evidence*

Wesselmann argues that the ALJ erred by failing to develop the record to obtain additional medical-opinion evidence. Wesselmann suggests that the ALJ should have obtained brain imaging or an opinion from a neurologist. Wesselmann also argues that even if the ALJ properly discounted Dr. Archer's RFC opinion, the ALJ's RFC determination was not supported by some medical evidence.

When determining a claimant's RFC, the ALJ must consider "all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations."[30] The ALJ's RFC determination must be supported by at least some medical evidence from a medical professional that "addresses the claimant's ability to function in the workplace."[31]

The state agency medical consultants' opinions included the same limitations the ALJ included in the RFC (e.g., avoid unprotected heights, never climb ladders, frequently climb ramps and stairs), except they did not include the need for unscheduled breaks due to seizures like the ALJ did. *See* AR 116-18, 141-143. The ALJ found these opinions persuasive, but he noted the need for an additional limitation related to Wesselmann suffering workplace seizures. AR 17. In addition, the ALJ largely credited Dr. Archer's medical opinion, agreeing that an RFC limitation was needed to account for Wesselmann suffering seizures at work. *Id.* As discussed, however, the ALJ reasoned that even if Wesselmann suffered weekly seizures (as found by Dr. Archer), not every seizure would occur at work and result in a workplace disruption. *Id.*

If the district court were to disagree with my analysis in the preceding section and find that substantial evidence supported the ALJ's RFC determination, I do not find that the medical-opinion argument would support a separate basis for reversal. "[T]here is

---

[30] *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000).

[31] *Hutsell v. Massanari*, 259 F.3d 707, 712 (8th Cir. 2001) (quoting *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001)).

no requirement that an RFC finding be supported by a specific medical opinion."[32] Here, the ALJ took both Dr. Archer's and the state agency medical consultants' opinions into consideration and struck a balance between the two.

I also reject Wesselmann's argument that the ALJ needed to further develop the record by obtaining an opinion from a neurologist. Wesselmann argues that brain imaging might have revealed that he suffered from cognitive damage because of his seizures and related falls, but there is no evidence (not even Wesselmann's testimony) that he had cognitive issues.

An ALJ need not obtain a consultative examination when "the evidence in the record provide[s] a sufficient basis for the ALJ's decision."[33] Accordingly, courts have held that *Nevland* (the case relied upon by Wesselmann) does not require remand when "other medical evidence in the record"—such as treatment notes—"clearly establishes a claimant's RFC to do other work[] and to function in the workplace."[34] "The ultimate question . . . is whether a critical issue was underdeveloped . . . such that the ALJ's

---

[32] *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016); *see also Anderson v. Shalala*, 51 F.3d 777, 779-80 (8th Cir. 1995) (holding that the ALJ's RFC determination was supported by substantial evidence when the ALJ relied on the opinions of two reviewing physicians; adopted some, but not all, of the limitations set forth by the treating physicians; and "conducted an independent analysis of the medical evidence").

[33] *Swink v. Saul*, 931 F.3d 765, 770 (8th Cir. 2019).

[34] *Kruger v. Colvin*, No. C13-3036-MWB, 2014 WL 1584411, at *10 (N.D. Iowa Apr. 21, 2014), *report and recommendation adopted by* 2014 WL 2884038 (N.D. Iowa June 25, 2014); *see also Becherer v. Colvin*, No. 4:12CV2356 ACL, 2014 WL 4230906, at *13 (E.D. Mo. Aug. 26, 2014) (noting that the claimant in *Nevland* "provided medical evidence that documented his limited functional capabilities" and holding that remand is not required when "no medical evidence in the record support[s] any greater limitations than those found by the ALJ"); *Symens v. Colvin*, No. CIV 13-3006-RAL, 2014 WL 843260, at *26 (D.S.D. Mar. 4, 2014) (holding that remand is not required under *Nevland* when "the ALJ engaged in an extensive review of the medical evidence. . . . [that] supported the ALJ's" RFC and "was also consistent with the reports from the" nonexamining state agency consultants); *Knight v. Astrue*, No. 12-06004-CV-SJ-NKL-SSA, 2012 WL 4092356, at *7 (W.D. Mo. Sept. 17, 2012) ("*Nevland* stands for the proposition that, where the claimant's alleged RFC is otherwise supported by substantial evidence in the record, the ALJ may not rely solely on the opinions of non-examining sources in rejecting the alleged RFC.").

decision was not supported by substantial evidence."[35] Here, I do not find that a neurological consultative examination was necessary.

Accordingly, if the district court were to disagree with my conclusion in Part A, I do not recommend reversing on the basis of "some medical evidence" or the failure to obtain a neurological consultative examination.

### III. CONCLUSION

I recommend **reversing** the Commissioner's decision and **remanding** for further proceedings.

Objections to this Report and Recommendation must be filed within fourteen days of service in accordance with 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections.[36] Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein.[37]

**DATED** February 8, 2022.

*[signature: Kelly K.E. Mahoney]*

Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa

---

[35] *Kruger*, 2014 WL 2884038, at *2; *see also* **20 C.F.R. §§ 404.1519a(b), 416.919a(b)** (Social Security Administration may purchase a consultative examination "to try to resolve an inconsistency in the evidence" or "when the evidence as a whole is insufficient" to resolve the claim).

[36] **Fed. R. Civ. P. 72**.

[37] *See United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).